SHEPARD, Chief Justice,
dissenting.
The system of justice seeks to provide a fair trial, but there is no entitlement to a perfect trial. I think the two reversals entered by the appellate courts in this case have unnecessarily sanitized the evidence against David Camm.
Amidst the mountainous evidence in this trial was Camm's declaration while in prison that his wife intended to leave him because of problems in their marriage and that he planned the killings on a night when the basketball game might provide an alibi. The credibility of this jail-house testimony (which included more direct admissions of guilt) might have been easier for the jury to assess had it known that David Camm was a serial adulterer whose activity recruiting sex partners persisted as late as ten days before the murders and continued through his pre-trial incarceration when he solicited a female guard at the jail.
The reversal after trial number one may have legitimately rested in part on the prosecution's use of twelve women to tell the stories of Camm's infidelity running back as far as nine years before these murders. The testimony about how Camm treated his wife during periods up closer to the killings seems probative of motive, but it does not surprise me that the prosecutors decided in trial number two not to run the risk of seeking to let the jury hear it.
I put in the same category this Court's tough stance of prohibiting any of the evidence that Camm's daughter had been molested within a day or two of the murders, evidence the prosecution has suggested indicated Camm killed the family so as to avoid responsibility or confrontation. After the first trial, the Court of Appeals summarized the available evidence on the topic this way:
The medical examiner who conducted Jill's autopsy testified that there was trauma to her genital region consistent with either molestation or a straddle fall; there was no penetration of the hymen, however. The State also presented evi-denee that Jill had complained of vaginal irritation on at least two prior occasions, the last time being a few days before the murders. Finally, it presented evidence that some of Jill's DNA was found on Camm's bedspread, which could have come from saliva or vaginal secretions. However, none of Jill's DNA was found in the two locations where seminal mate *238 rial from Camm was also found on the bedspread. In fact, at one of those locations Camm's seminal material was mixed with Kim's DNA.
Camm, 812 N.E.2d at 1140. The defense lawyers who have been so effective as to win two reversals did not even bother to object to this evidence during trial number one. I regard this evidence as providing an inference about Camm's motive and dissent from today's decision to bar the jury from hearing it.
Finally on admission of evidence, the Court reverses because the witness quoted Kim Camm as saying, "she was expecting her husband home between 7:00 and 7:80 ..," citing Evidence Rule 808(@). The Court suggests that it might permit a witness to quote a victim as saying, "I plan to be home between 7:00 and 7:80." This suggested distinction appears to indicate that a reversal would be required if instead the victim had told her friend, "I plan to be home between 7:00 and 7:80 so I can meet my husband." The Court has cut a pretty fine line today on what is permitted and what is prohibited under Rule 803(8). I do not see so large a space of daylight here as my colleagues do. It is not the stuff upon which reversals are warranted.
Part of the reason I regard reversal as unwarranted is the rest of the evidence the jury heard. The Court passes over in two sentences Camm's confessions of guilt to three different inmates. Twenty-four jurors apparently credited their testimony.
But, one may put those witnesses aside and ask instead what the jury made of Camm's own version of the events.
Camm says he came home to a horrific scene, concluded his son was warm and might still be saved, decided to go inside the house, called a distant police agency, turned down three suggestions that medical help be sent, and only then went back to the garage to administer CPR. Or ask what the jury probably made of Camm's phone call at 7:15 a.m. the morning after the murder to inquire at Kim's work about her employment benefits. Or his request that very same day that an acquaintance who was in the crime scene cleaning business come to clean out the vehicle that contained evidence about the murders.
I would affirm the jury's verdict.